**Douglas EL**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

**No. Civ.A.02–CV–3591.**

United States District Court, E.D. Pennsylvania.

July 12, 2005.

David A. Cohen, Spector, Roseman & Kodroff, Philadelphia, PA, Timothy M. Kolman, Wayne A. Ely, Timothy M. Kolman and Associates, Langhorne, PA, for Plaintiff.

Dennis L. Scanlon, Robert J. Haurin, Ronald W. Boak, Saul H. Krenzel, Saul H. Krenzel & Associates, for Defendant.

Jeffrey Brian Killino, Philadelphia, PA, for Movant.

Robyn Rachelle Ray, Schubert Bellwoar Cahill & Quinn, Philadelphia, PA, for Third-Party Defendant.

### *MEMORANDUM AND ORDER*

JOYNER, District Judge.

This employment discrimination action is presently before the Court on motion of the defendant for summary judgment. For the reasons which follow, the motion shall be granted as to the plaintiff's federal law claims and this case dismissed with leave to Plaintiff to re-file his remaining state law claim in the appropriate state court.

### *History of the Case*

On or about January 3, 2000, the plaintiff, Douglas El, applied for a job as a driver for King Paratransit Services, Inc. in King of Prussia, PA. In his written job application, Mr. El disclosed that he had been convicted of second degree homicide for his role in a gang-related incident in 1960 when he was fifteen years old and that he had served some 3½ years in state prison for the crime. He also executed a criminal history release to enable King to obtain a copy of his criminal record as a condition to employment. On January 18, 2000, King extended a conditional offer of employment to Mr. El contingent upon successful completion of regulatory requirements, the meeting of any and all contractual requirements, criminal background investigations and favorable responses of his record and character and Mr. El began a two-week paratransit driver training course. Although Plaintiff completed that first week of the training course, he missed part of the second week because a snowstorm made it impossible for him to get to training from his home in Philadelphia. Mr. El therefore had to restart his training on January 31, 2000 and he continued to attend paratransit training until February 8, 2000 when he was terminated solely because of his 40–year–old homicide conviction.

King Paratransit was under contract with the Southeastern Pennsylvania Transportation Authority ("SEPTA"), the defendant here, to provide paratransit services in Bucks County, Pennsylvania. Pursuant to Section F2.10.1 of that contract, King was prohibited, *inter alia,* from placing in SEPTA service, any paratransit driver who had a record of driving under the influence of alcohol or drugs (DUI) or a record of any felony or misdemeanor conviction for any crime of moral turpitude or of violence against any person(s).

On November 30, 2000, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission

("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") against SEPTA, alleging that SEPTA forced King to fire him illegally, that SEPTA's policy of excluding persons from employment based upon their conviction records had an adverse impact on African–Americans in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(k), and that neither King nor SEPTA could show a business necessity for denying him a job or firing him based upon his 40–year–old criminal conviction. In its Determination dated September 14, 2001, the EEOC agreed with Plaintiff that SEPTA's "policy or practice of excluding individuals from employment on the basis of their conviction records has a disparate impact on blacks and Hispanics in light of statistics showing that they are convicted at a rate disproportionately greater than their representation in the population." Consequently, the Commission held that "such a policy or practice is unlawful under Title VII in the absence of a justifying business necessity." Furthermore, the Commission held that as there was no evidence that SEPTA considered such factors as the nature and gravity of the offense, the time that had passed since the conviction and/or completion of the sentence and the nature of the job held or sought, it acted on a policy which unlawfully served as an absolute bar to employment for individuals who had certain types of criminal convictions. Efforts to conciliate the matter apparently proved unsuccessful and Plaintiff instituted this lawsuit

on June 4, 2001, alleging violations of Title VII, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Article I, Section I of the Pennsylvania Constitution and the Pennsylvania Criminal History Record Information Act, 18 Pa.C.S. § 9125.[1] After numerous extensions of the scheduling order deadlines and the taking of voluminous discovery, Defendant now moves for the entry of summary judgment in its favor on all of the counts in Plaintiff's complaint, as amended.

### Standards Applicable to Summary Judgment Motions

Summary judgment is appropriate where, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Michaels v. New Jersey,* 222 F.3d 118, 121 (3d Cir.2000); *Jones v. School District of Philadelphia,* 198 F.3d 403, 409 (3d Cir.1999). Indeed, the standards to be applied by district courts in ruling on motions for summary judgment are clearly set forth in Fed.R.Civ.P. 56(c), which states, in pertinent part:

"....The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A sum-

---

1. In his First Amended Complaint, Plaintiff also included various "Class Action Allegations," by which he sought to have this matter cast as a class action on behalf of "all people who have been denied employment between January 1, 1991 and the present, by any company that has provided paratransit services for SEPTA as a result of a past felony or misdemeanor conviction." (First Amended Class Action Complaint, ¶ 28). As it appears to the Court that Plaintiff has abandoned his

efforts to pursue this matter as a class action, no further discussion or analysis on this point is warranted in this memorandum. Likewise, as Plaintiff also indicates in his Memorandum in Opposition to Defendant's Motion for Summary Judgment that he is withdrawing his claim under the Criminal History Record Act, judgment as a matter of law shall be entered in the defendant's favor as to that claim without further discussion here.

mary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

Under this rule, a court is compelled to look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C.Cir. 1988), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Aries Realty, Inc. v. AGS Columbia Associates*, 751 F.Supp. 444 (S.D.N.Y.1990). In considering a summary judgment motion, the court must view the facts in the light most favorable to the non-moving party and all reasonable inferences from the facts must be drawn in favor of that party as well. *Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 126 (3rd Cir.1994); *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3rd Cir.1989); *U.S. v. Kensington Hospital*, 760 F.Supp. 1120 (E.D.Pa.1991).

"Material" facts are those facts that might affect the outcome of the suit under the substantive law governing the claims made. An issue of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" in light of the burdens of proof required by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986); *The Philadelphia Musical Society, Local 77 v. American Federation of Musicians of the United States and Canada*, 812 F.Supp. 509, 514 (E.D.Pa.1992). Thus, a non-moving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 138 (3d Cir.2001).

## Discussion

### I. Plaintiff's Title VII Claims

As noted, Plaintiff first asserts that Defendant SEPTA violated Title VII by imposing a uniform employment policy on its paratransit subcontractors prohibiting them from employing anyone who had a past felony or misdemeanor conviction for "any crime of moral turpitude or violence against any person(s)" without inquiring into how long ago the conviction occurred, the circumstances surrounding the conviction or the relationship between the conviction and the position sought.

As a general rule, Title VII, 42 U.S.C. § 2000e–2(a) provides:

It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The objective of Congress in the enactment of Title VII was plain by the language of the statute: to achieve equality of employment opportunities and to remove barriers that had operated in the past to favor an identifiable group of white employees over other employees. *Griggs v. Duke Power Company*, 401 U.S. 424, 429–430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Thus the Supreme Court recog-

nized that under the Act, practices, procedures or tests neutral on their face and even neutral in terms of intent, could not be maintained if they operated to "freeze" the status quo of prior discriminatory employment practices. *Id.* Indeed, the Court held "the Act proscribes not only overt discrimination but also practices that are fair in form but discriminatory in operation" with the touchstone being business necessity. *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853.

Stated otherwise, employment practices resulting in a disparate impact on someone because of his or her race, color, religion, sex or national origin are forbidden. In this regard, 42 U.S.C. § 2000e–2(k) now provides in relevant part:

> (1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—
>
> > (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or
> >
> > (ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the

respondent refuses to adopt such alternative employment practice.[2]

. . . . .

■ Accordingly, to succeed under Title VII's disparate impact theory of liability, a plaintiff must initially show that a facially neutral policy results in a discriminatory hiring pattern. *Foster v. New Castle Area School District*, 98 Fed.Appx. 85, 89 (3d Cir.2004). Plaintiffs can establish a prima facie case of disparate impact by demonstrating that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern. *Lanning v. SEPTA*, 181 F.3d at 485, citing *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). *See Also, Tomaselli v. Upper Pottsgrove Township*, Civ. A. No. 04–2646, 2004 WL 2988515 at *4–5, 2004 U.S. Dist. LEXIS 25754 at *13–*14 (E.D.Pa. Dec. 23, 2004) ("Disparate impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.") A plaintiff may meet this burden by identifying a particular employment practice that creates a disparate impact on a protected group through statistical evidence, although the statistical evidence must be "of a kind and degree sufficient to show that the practice in question has caused" the disparate impact.

---

**2.** Specifically, Section 2000e–2(k)(1)(C) states:

> The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice."

It should be noted that Subsection (k), enacted as part of the Civil Rights Act of 1991, was Congress' response to the June 5, 1989 decision by the U.S. Supreme Court in *Wards Cove v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) wherein the Court held that a challenged employment practice

need only serve, in a significant way, the legitimate employment goals of the employer. One of the primary purposes of the 1991 Act was to codify the concepts of 'business necessity' and 'job related' enunciated by *Griggs, supra,* and in the other Supreme Court cases prior to *Wards Cove.* As part of this codification of *Griggs,* the Act made clear that both the burden of production and the burden of persuasion in establishing business necessity rest with the employer. *Lanning v. Southeastern Pennsylvania Transportation Authority,* 181 F.3d 478, 487 (3d Cir.1999) (citations omitted).

*Lawton v. Sunoco*, Civ. A. No. 01–2784, 2002 WL 1585582 at *9, 2002 U.S. Dist. LEXIS 13039 at *28 (E.D.Pa. July 17, 2002), *aff'd*, 65 Fed.Appx. 874 (3d Cir. 2003), quoting *Johnston v. City of Philadelphia*, 863 F.Supp. 231, 235 (E.D.Pa. 1994). *See Also, Spence v. City of Philadelphia*, Civ. A. No. 03–3051, 2004 WL 1576631 at *7 (E.D.Pa. July 1, 2004) ("Plaintiff's burden under the disparate impact analysis goes beyond the need to show statistical disparities in the work force. Plaintiff must show a causal connection between the challenged policy and a racially unequal result," quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) and *EEOC v. Greyhound Lines*, 635 F.2d 188, 193 (3d Cir.1980)).

■ Once the plaintiff has established a prima facie case, the burden shifts to the employer to show that the employment practice is job related for the position in question and consistent with business necessity. *Id.* In so doing, it is incumbent upon the employer to demonstrate that the employment practice operates to measure the minimum qualifications necessary for successful performance of the job in question. *See, Lanning*, 181 F.3d at 489–490; *United States v. Delaware*, Civ. A. No. 01–020, 2004 WL 609331 at *22–25, 2004 U.S. Dist. LEXIS 4560 at *84, *89–90, 93 Fair Empl. Prac. Cas (BNA) 1248 (D.Del. March 22, 2004). Should the employer meet this burden, the plaintiff may still prevail if he can show an alternative employment practice has a less disparate impact and would also serve the employer's legitimate business interest. *Id.*, citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Wilson v. PPL Electric Utilities Corp.*, Civ. A. No. 02–CV–4662, 2004 WL 764803 at *3–4, 2004 U.S. Dist. LEXIS 6686 at *11 (E.D.Pa. March 31, 2004). Thus while it has been recognized that a blanket policy of denying employment to any person having a criminal conviction violates Title VII, if the criminal conviction involved conduct which demonstrates a person's lack of qualification for the job, Title VII would not be violated. *See, Field v. Orkin Exterminating Co., Inc.*, Civ. A. No. 00–5913, 2001 WL 34368768 at *3 (E.D.Pa. Oct. 30, 2001), citing, *inter alia, Carter v. Gallagher*, 452 F.2d 315, 326 (8th Cir.1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) and *Washam v. J.C. Penney Co., Inc.*, 519 F.Supp. 554, 561 (D.Del.1981).

While it does not dispute that it is an employer generally within the meaning of Title VII, SEPTA argues at the outset that it cannot be held liable to Plaintiff for any Title VII violations as it was not *his* employer. We therefore shall address this argument first.

Under 42 U.S.C. § 2000e(b),

The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service ... or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26 ...

■ Pursuant to 42 U.S.C. § 2000e(f),

The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be

on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State governmental agency or political subdivision . . .

The Third Circuit has held "that the proper inquiry under Title VII for determining employer status looks to the nature of the relationship regardless of whether that party may be described as an 'employer.'" *Graves v. Lowery*, 117 F.3d 723, 728 (3d Cir.1997). "The inquiry, . . . looks to the level of control an organization asserts over an individual's access to employment and the organizations' power to deny such access." *Id.*, citing *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1342 (D.C.Cir.1973). Thus, the precise contours of an employment relationship can only be established by a careful factual inquiry. *Graves*, 117 F.3d at 729; *Schepis v. Raylon Corporation*, Civ. A. No. 03–5970, 2004 WL 1902382 at *1, 2004 U.S. Dist. LEXIS 17127 at *2 (E.D.Pa. Aug. 23, 2004).

■ According to the deposition testimony from several SEPTA representatives, including Frank Brandis and James Foley, SEPTA prohibits anyone with a past criminal conviction for homicide from providing paratransit services for it. In the event that it discovers that a paratransit subcontractor is employing a driver with such a criminal record, SEPTA will require that subcontractor to remove that driver from SEPTA service. Similarly, SEPTA also has the authority to have a driver removed, re-assigned or re-trained if, for example, the driver fails to conduct himself properly, complete his trips, fails to report an accident or if there are too many complaints about him. (See, e.g. Depositions of Frank Brandis, pp. 106–107, 138–139 and James Foley, pp. 87–89). In addition, as several representatives of the

paratransit subcontracting companies testified, Mr. Brandis and SEPTA have on several occasions specifically directed them to decline to hire someone or terminate an employee because of their criminal record. (See, e.g. Depositions of Deborah Hartman, pp. 46–48 and Pamela Fiorillo, pp. 24, 42–50). In light of this evidence, we find that issues of material fact exist as to whether SEPTA exercised sufficient control over the plaintiff's employment with King Paratransit Services to render it an employer within the meaning of Title VII. Accordingly, summary judgment on this basis must be denied.

■ Similarly, we find that the plaintiff has adduced sufficient evidence that SEPTA's minimum requirements for paratransit drivers had a disparate impact on African–Americans. On this point, the plaintiff has produced an Expert Report by Dr. William B. Fairley, who possesses Bachelor's and Doctorate degrees in Statistics from Swarthmore College and Harvard University and who has taught statistics at, *inter alia*, New York University, Swarthmore College, Temple University, Harvard University and the University of Karachi in Pakistan. Dr. Fairley reviewed the SEPTA criminal record policy at issue in conjunction with the personnel records of SEPTA's paratransit subcontractors and national data sources from the U.S. Bureau of Justice Statistics and the *Statistical Abstract of the U.S.* According to Dr. Fairley, "Nonwhites are substantially more likely to have a conviction than Whites nationally in both State and Federal Courts." (See Report of William B. Fairley, Ph.D. dated July 15, 2004 p. 11). In Dr. Fairley's opinion, minority employees of SEPTA's paratransit providers are disparately impacted by the SEPTA policy in that they are dismissed from employment due to convictions at a rate that is 200 percent

greater than non-minorities. (Fairley Report, p. 12–13).

■ In response to Dr. Fairley's opinions, the defendants have produced the expert report of Dr. David Griffin, Ph.D., who is equally as qualified as is Dr. Fairley to render an opinion on the issue of whether the SEPTA policy had a (statistical) disparate impact on minority employees. Specifically, Dr. Griffin, who holds a Doctorate in Economics from Cornell University and Master's and Bachelor's degrees in economics from Rutgers University, opines that Dr. Fairley's opinions are fundamentally flawed because he failed to, *inter alia,* study those employees who were actually dismissed or disqualified because of a criminal conviction (instead assuming they would be dismissed on that basis), failed to weight the data which he used, and failed to use all of the data which was available to him (failing to use at all the data available for one paratransit provider). Although we find Dr. Griffin's criticisms persuasive, the defendant has withdrawn its *Daubert* challenge to Dr. Fairley, albeit without prejudice. Thus, as the matter of determining the admissibility of expert testimony is not appropriately done on summary judgment and the matter of crediting the testimony of these expert witnesses is properly left to the jury, Defendant's motion for summary judgment on the basis of the plaintiff's alleged failure to show disparate impact must be denied. *See Also, Rohrbach v. AT & T Nassau Metals Corp.,* Civ. A. No. 3:CV–89–1268, 1994 U.S. Dist. LEXIS 14457 AT *8 (M.D.Pa. June 22, 1994) ("Based upon the expert reports, as well as upon *Daubert, supra,* it would be inappropriate to grant summary judgment based upon the alleged deficiencies in the expert reports.").

■ The plaintiff having made a sufficient showing of a prima facie case, we next consider whether SEPTA has shown that the employment practice is job related for the position in question and consistent with business necessity. Again, as the business necessity test asks whether there are other ways for an employer to achieve its goals that do not result in a disparate impact, it is incumbent upon the employer to demonstrate that the employment practice operates to measure the minimum qualifications necessary for successful performance of the job in question. *See Also, Smith v. City of Jackson, Miss.,* 544 U.S. 228, 125 S.Ct. 1536, 1546, 161 L.Ed.2d 410 (2005).

■ Specifically, the policy at issue in this case is contained in Section F2.10.1(e) and (f) of SEPTA's contracts with its paratransit providers under the heading "General Minimums." That section states, in relevant part:

Prior to the Contractor's utilizing any current employee of Contractor, or any applicant for employment with Contractor, in SEPTA contract ParaTransit Service, the Contractor shall ensure that all drivers and attendants utilized in SEPTA service have met the following minimum requirements:

.　　.　　.　　.　　.

e.　NO RECORD OF DRIVING UNDER INFLUENCE (DUI) OF ALCOHOL OR DRUGS, AND NO RECORD OF ANY FELONY OR MISDEMEANOR CONVICTION FOR ANY CRIME OF MORAL TURPITUDE OR OF VIOLENCE AGAINST ANY PERSON(S);

f.　HAVE NO RECORD OF ANY CONVICTION WITHIN THE LAST SEVEN (7) YEARS FOR ANY OTHER FELONY OR ANY OTHER MISDEMEANOR IN ANY CATEGORY REFERENCED BELOW (SEE SECTION F.2.10.C), AND NOT BE ON PROBATION

OR PAROLE FOR ANY SUCH CRIME, NO MATTER HOW LONG AGO THE CONVICTION FOR SUCH CRIME MAY BE;

The defendant has produced ample evidence via the expert reports of Dr. Griffin, and Drs. Alfred Blumstein and Dick Sobsey that the above SEPTA policy is job related for the position in question and consistent with business necessity. Specifically, Defendants' experts attest that: (1) "former prisoners are much more likely to engage in criminal conduct (subsequent to release) than the 'typical' adult in the general population. . . . [R]eleased prisoners are approximately 31 times more likely to engage in homicide, 5–6 times more likely to engage in rape, and 10–11 times more likely to engage in assault than a randomly selected adult from the general population . . .";[3] (2) "[b]ased on this analysis relevant to assessing the risks associated with individuals with prior convictions for a violent offense, it is entirely prudent and reasonable for SEPTA, in fulfilling its responsibility to do whatever it can to protect the vulnerable population that uses its paratransit services, to require drivers hired to be free of any such convictions. While it is entirely possible that some such individuals no longer pose such a great risk, neither SEPTA nor its contractors who make the hiring decisions are in a position to make the clinical judgment that even parole boards have difficulty making—to be able to distinguish those who pose a risk from those who do not . . .,"[4] and (3) ". . . Specialized transportation services serving people with disabilities and senior citizens are inherently high-risk environments for victimization and every effort must be made to provide the safest possible services. Criminal record checks provide an essential component of the necessary protection . . .; . . . a reasonable policy to control the risk of victimization of passengers is one that prohibits any individual who has been convicted of a sexual offense, has been convicted of a crime of violence, or has committed a crime against a vulnerable person from being a paratransit driver, regardless of the amount of time that has passed since the conviction. The SEPTA policy reduces the risk of victimization for a population that is known to have elevated risk."[5] Thus we find that SEPTA has met its burden of proving that the criminal record/employment policy which Plaintiff challenges here operates to measure the minimum qualifications necessary for successful performance of the job in question, i.e., paratransit driver.

■ Accordingly, we next consider whether the plaintiff can show an alternative employment practice that has a less disparate impact and would also serve the employer's legitimate business interest.

In this regard, Mr. El points to SEPTA's policy for hiring its own fixed route bus, train, trolley, etc. drivers. That policy, which is numbered 6.29.2 provides in relevant part:

B. Use of Conviction Records of Job Applicants Who Accurately Disclose Convictions for Any Criminal Offense, Regardless of How Minor, on Employment Application Form

1. Conviction records or information about convictions may be considered by the Authority when:

---

3. Report of Dr. David Griffin, dated September 20, 1994 at p. 2, ¶ 2, annexed to Defendant's Motion for Summary Judgment as Exhibit "II."

4. Report of Dr. Alfred Blumstein dated October 4, 2004 at p. 8, annexed to Defendant's Motion for Summary Judgment as Exhibit "CC."

5. Report of Dr. Richard (Dick) J. Sobsey, dated September 22, 2004, at p. 21, annexed to Defendant's Motion for Summary Judgment as Exhibit "AA."

a. (1) The conviction(s) is for any murder, felony, misdemeanor of any degree and

(2) The conviction relates to the applicant's suitability for employment in the position for which he/she has applied.

b. In the event that the Authority decides not to hire the applicant based in whole or in part on the applicant's criminal history record information, which he/she has accurately disclosed on his/her employment application, then the Authority shall notify the applicant in writing, setting forth the basis for the rejection.

c. The following sets forth some examples of the types of convictions for criminal offenses that may preclude a job applicant from employment; however, these examples are not all inclusive, neither as to type of offense, nor as to the specific job classifications listed:

| *Murder, Felony Misdemeanor of any Degree for:* | *Job Classifications* |
|---|---|
| ... | |
| Physical offenses against other persons (including murder, robbery, assault, kidnaping, sexual offenses and corrupting the morals of minors) | All police positions All positions bringing employee into contact with the public, such as operators, or positions that are isolated or remote situations. |
| ... | |

d. It shall be the responsibility of the Senior Director, Human Resources or his/her designee, in consultation with SEPTA's Legal Department and the Deputy General Manager, when necessary, to decide whether or not a specific job applicant with a criminal conviction may be hired. In all instances when an applicant with a criminal record is being considered for a position within Operations, the Chief of Operations must also approve the applicant in writing. In the event an applicant is not hired because of a criminal record, the Senior Director, Human Resources shall advise the applicant in writing of the basis for the decision not to hire.

As Carla Elliott, Esquire, of SEPTA's Human Resources Department testified, under this policy when a job applicant reveals that they have been previously convicted of a crime, their application is given heightened scrutiny to determine the suitability of that applicant for the position for which they are applying. (Elliott Deposition, annexed as "Exhibit 6" to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at pp. 65–67). It is then up to the Senior Director of Human Resources to decide, after consulting with SEPTA's Deputy General Manager and the Legal Department, whether or not a specific job applicant with a criminal conviction can be hired. (Elliott Dep., at pp. 68, 72–74). SEPTA itself thus does not automatically preclude a job applicant from a position with it because of a criminal record, but rather on a case-by-case basis gives such applications heightened scrutiny to determine whether the conviction is sufficient to find that candidate unsuitable for the position for which he or she has applied. (Elliott Dep., at pp. 88–90).

In carefully reviewing the record in this case, we note that while the paratransit contractors clearly have the capability to also perform a case-by-case analysis of each prospective employee, SEPTA simply considered some offenses to be so serious that it didn't want applicants with such convictions on their records to be employed in SEPTA paratransit service no matter how long ago the convictions had occurred. (*See,* Deposition of Lisa Soltner, annexed to Defendant's Motion for Summary Judgment as "Exhibit U," pp. 167–169; Deposition of Vincent J. Walsh, Jr., Esquire, annexed as "Exhibit 17" to

Plaintiff's Response to Defendant's Summary Judgment Motion at pp. 50–52, 65). In thus making a distinction between the employment policy which it utilized in hiring its own, fixed route drivers and the policy which it imposed on its paratransit subcontractors, SEPTA considered that in stark contrast to fixed route transportation where large numbers of able-bodied people were picked up at the same designated stops and rode the same route at the same time each day, paratransit served the most vulnerable physically and mentally disabled passengers by picking them up at their own homes at different times and following different routes, depending upon where the handicapped passenger needed to go. In addition, paratransit drivers are required to be in close physical proximity to their passengers in that they must physically assist them into and out of the vehicles and are often alone in paratransit vehicles with them. (Deposition of Vincent Walsh, at pp. 87–89). This distinction is, we find, clearly job related to the driver position in question and consistent with business necessity. Furthermore, given that we can find no evidence whatsoever on this record in the report of Dr. Fairley or elsewhere from which a jury could find that implementation of SEPTA's internal Policy 6.29 would have any less of a disparate impact on minority paratransit driver applicants than does the policy which is currently imposed on them under the subcontracts, we can reach no other conclusion but that the plaintiff has failed to satisfy the burden of proof needed to sustain a claim under Title VII. Consequently summary judgment must be granted to the defendant on Count I of the Amended Complaint.

## II. Plaintiff's Equal Protection Claim

Plaintiff next asserts that SEPTA "committed deliberate, ongoing and repeated violations of the Equal Protection Clause of the Fourteenth Amendment by requiring its paratransit contractors to deny public employment to all persons with a misdemeanor or felony conviction without inquiring into how long ago the conviction occurred, the circumstances surrounding the conviction or the relation between the conviction and the position sought or held because these requirements are not reasonably related either to the person's fitness to perform the job at issue or to any legitimate government objective." (Amended Complaint, ¶ 46).

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), quoting U.S. Const., Amdt. 14, § 1. Its central purpose is the prevention of official conduct discriminating on the basis of race. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *City of Cuyahoga Falls v. Buckeye Community Hope Foundation,* 538 U.S. 188, 194, 123 S.Ct. 1389, 1394, 155 L.Ed.2d 349 (2003). *See Also, Development Group, LLC v. Franklin Township Board of Supervisors,* Civ. A. No. 03–2936, 2003 WL 22358440, *6, 2003 U.S. Dist. LEXIS 18042, * 18–19 (E.D.Pa. Sept. 24, 2003) ("To proceed on such a [equal protection] theory, Plaintiffs must allege facts demonstrating that Defendants, acting under color of state law, intentionally treated Plaintiffs differently from others similarly situated and that there is no rational basis for the difference in treatment.") Thus, official action will not be held unconstitutional solely because it results in a racially disproportionate impact. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–265, 97 S.Ct. 555, 563, 50

L.Ed.2d 450 (1977). This is not to say that disproportionate impact is irrelevant, but it is not the sole touchstone of an invidious racial discrimination. *Id.,* citing *Davis,* 426 U.S. at 242, 96 S.Ct. at 2049.

 There are three ways that such intentional discrimination can be shown: (1) a law or policy that explicitly classifies citizens on the basis of race; (2) a facially neutral law or policy which is applied differently on the basis of race; or (3) a facially neutral law or policy that was motivated by discriminatory intent and has a racially discriminatory impact, even if it is applied evenhandedly. *Antonelli v. State of New Jersey,* 310 F.Supp.2d 700, 714 (D.N.J.2004), citing *Hunt v. Cromartie,* 526 U.S. 541, 546, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Village of Arlington Heights, supra,* and *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). To prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker adopted the policy at issue "because of," not merely "in spite of," its adverse effects upon an identifiable group. *Pryor v. National Collegiate Athletic Ass'n.,* 288 F.3d 548, 562 (3d Cir.2002), quoting *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). A mere awareness of an otherwise neutral policy will not suffice. *Id.*

 Once a plaintiff establishes a discriminatory purpose based on race the decisionmaker must come forward and try to show that the policy or rule at issue survives strict scrutiny, *i.e.,* that it had a compelling interest in using a race-based classification and this classification is narrowly tailored to achieve that compelling interest. *Id.* Finally, "determining whether invidious discriminatory purpose was a motivating factor in the adoption of a facially neutral policy demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Pryor,* 288 F.3d at 563, quoting *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555.

 In application of all of the preceding principles to the case at hand, we find that there is no evidence whatsoever on this record that SEPTA enacted or imposed the criminal record policy at issue on its paratransit subcontractors for the purpose of discriminating against African–Americans or any other minority for that matter. Rather, as we discussed in Section I above, the evidence clearly shows that SEPTA's sole intention and purpose in enacting the criminal record/employment policy which Plaintiff challenges here was to provide its most vulnerable passengers with safe and reliable transportation. Thus, notwithstanding that he has produced evidence that the policy disparately impacts African–American applicants, the complete absence of any evidence that the policy was enacted "because of" its adverse effects on this identifiable group is fatal to Plaintiff's Equal Protection Claim. Summary judgment shall therefore be entered in favor of the defendant on Count II of the Amended Complaint.

## III. Plaintiff's Claim Under the Pennsylvania Constitution

In Count III, Mr. El contends that "SEPTA has committed deliberate, ongoing and repeated violations of Article I, Section I of the Pennsylvania Constitution by requiring its paratransit providers to deny public employment to all persons with a misdemeanor or felony conviction without inquiring into how long ago the conviction occurred, the circumstances surrounding the conviction, or the relation between the conviction and the position sought (or held) because these requirements are not reasonably related either to the person's fitness to perform the job at

issue or to any legitimate government objective." (Am.Compl., ¶ 50).

■ Article I, § 1 of the Pennsylvania Constitution reads as follows:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

This section, like the due process clause in the Fourteenth Amendment of the United States Constitution, guarantees persons in the Commonwealth of Pennsylvania certain inalienable rights. *Nixon v. Commonwealth, Department of Public Welfare,* 576 Pa. 385, 839 A.2d 277, 286 (2003). Included among these rights, although not fundamental, is the right to pursue a lawful occupation. *Nixon,* 839 A.2d at 288; *Adler v. Montefiore Hospital Association of Western Pennsylvania,* 453 Pa. 60, 311 A.2d 634 (1973). Such a right is therefore subject to the rational basis test, *i.e.,* a state may not deprive an individual of that right unless it can be shown that such deprivation is reasonably related to the state interest that is sought to be protected. *Warren County Human Services v. State Civil Service Commission,* 844 A.2d 70, 73 (Pa.Cmwlth.2004). For these reasons, provisions which operate to deny public employment to someone on the basis of a prior criminal conviction have been held violative of the Pennsylvania Constitution unless that denial is reasonably related to the furtherance of a legitimate public objective. *Hunter v. Port Authority of Allegheny County,* 277 Pa.Super. 4, 419 A.2d 631, 638 (1980).

As the Pennsylvania Supreme Court has recognized,

There is no question that protecting the elderly, disabled and infirm from being victimized is an important interest in this Commonwealth and that the General Assembly may enact laws that restrict who may work with these individuals. Further, barring certain convicted criminals from working with these citizens may be an effective means of protecting such citizens from abuse and exploitation.

*Nixon,* 839 A.2d at 288.

■ As discussed, SEPTA in this case has amassed significant evidence of the greatly increased risk that former convicts will again engage in criminal conduct as well as the inherent dangers posed to the vulnerable handicapped and disabled passengers by the very nature of the paratransit services which SEPTA must provide. While we would likewise conclude that this evidence more than adequately evinces a rational basis for the employment policy which SEPTA imposes on its paratransit contractors, we nevertheless take note of what appears to be an unresolved issue of Pennsylvania state law posed by the Commonwealth Court's holding in *Warren County, supra* that the lifetime ban under Pennsylvania's Child Protective Services Law, 23 Pa.C.S. § 6344(c)(2) prohibiting previously convicted applicants from employment in childcare is unconstitutional.[6] Accordingly, we shall exercise our discretion to decline to exercise our supplemental jurisdiction any further and shall therefore defer this matter to the Pennsylvania state courts. *See,* 28 U.S.C. § 1367(c).

An appropriate order follows.

### ORDER

AND NOW, this 12th day of July, 2005, upon consideration of Defendant's Motion

---

**6.** The Pennsylvania Supreme Court expressly declined to address this issue in *Nixon,* 839 A.2d at 288, n. 16 but noted that those courts which have addressed the rationality of this type of ban have been divided.

for Summary Judgment and Plaintiff's Response thereto, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART and judgment as a matter of law is entered in favor of Defendant and against Plaintiff in no amount on Counts I, II and IV of Plaintiff's Amended Complaint.

IT IS FURTHER ORDERED that the Motion is DENIED as to Count III alleging violations of Article I, Section I of the Pennsylvania Constitution, but as this Court declines to continue exercising supplemental jurisdiction pursuant to 28 U.S.C. § 1367, Count III of this action is hereby DISMISSED with leave to Plaintiff to re-file it in the appropriate Pennsylvania state court.