CITY OF CUYAHOGA FALLS, OHIO, ET AL. *v.* BUCK-
EYE COMMUNITY HOPE FOUNDATION ET AL.

No. 01–1269.   Argued January 21, 2003—Decided March 25, 2003

O'CONNOR, J., delivered the opinion for a unanimous Court.  SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 200.

*Glen D. Nager* argued the cause for petitioners.   With him on the briefs were *Virgil Arrington, Jr., Michael A. Carvin,* and *Michael S. Fried.*

*David B. Salmons* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal.   With him on the brief were *Solicitor General Olson, Assistant Attorney General Boyd, Deputy Solicitor General Clement, Mark L. Gross,* and *Teresa Kwong.*

*Edward G. Kramer* argued the cause for respondents. With him on the brief were *Diane E. Citrino, Kenneth Kowalski,* and *Michael P. Seng.**

---

*Briefs of *amici curiae* urging reversal were filed for the City of Athens, Ohio, et al. by *Barry M. Byron, John E. Gotherman,* and *Garry E. Hunter;* and for the International Municipal Lawyers Association et al. by *Henry W. Underhill, Jr., Charles M. Hinton, Jr.,* and *Brad Neighbor.*

Briefs of *amici curiae* urging affirmance were filed for the Lawyers' Committee for Civil Rights Under Law et al. by *Barbara Arnwine, Thomas J. Henderson, Cheryl L. Ziegler, Eva Jefferson Paterson, Javier N. Maldonado,* and *Michael Churchill;* for the National Association of Home Builders by *Thomas Jon Ward;* for the National Fair Housing Alliance et al. by *Joseph R. Guerra, Thomas Healy, John P. Relman, Meera*

JUSTICE O'CONNOR delivered the opinion of the Court.

In 1995, the city of Cuyahoga Falls, Ohio (hereinafter City), submitted to voters a facially neutral referendum petition that called for the repeal of a municipal housing ordinance authorizing construction of a low-income housing complex. The United States Court of Appeals for the Sixth Circuit found genuine issues of material fact with regard to whether the City violated the Equal Protection Clause, the Due Process Clause, and the Fair Housing Act, 82 Stat. 81, as amended, 42 U. S. C. § 3601 *et seq.*, by placing the petition on the ballot. We granted certiorari to determine whether the Sixth Circuit erred in ruling that respondents' suit against the City could proceed to trial.

I

A

In June 1995, respondents Buckeye Community Hope Foundation, a nonprofit corporation dedicated to developing affordable housing through the use of low-income tax credits, and others (hereinafter Buckeye or respondents), purchased land zoned for apartments in Cuyahoga Falls, Ohio. In February 1996, Buckeye submitted a site plan for Pleasant Meadows, a multifamily, low-income housing complex, to the city planning commission. Residents of Cuyahoga Falls immediately expressed opposition to the proposal. See 263 F. 3d 627, 630 (CA6 2001). After respondents agreed to various conditions, including that respondents build an earthen wall surrounded by a fence on one side of the complex, the commission unanimously approved the site plan and submitted it to the city council for final authorization.

As the final approval process unfolded, public opposition to the plan resurfaced and eventually coalesced into a refer-

*Trehan,* and *Robert G. Schwemm;* and for the National Multi Housing Council et al. by *Leo G. Rydzewski* and *Clarine Nardi Riddle.*

*John H. Findley* and *Meriem L. Hubbard* filed a brief for the Pacific Legal Foundation et al. as *amici curiae.*

endum petition drive. See Cuyahoga Falls City Charter, Art. 9, § 2, App. 14 (giving voters "the power to approve or reject at the polls any ordinance or resolution passed by the Council" within 30 days of the ordinance's passage). At city council meetings and independent gatherings, some of which the mayor attended to express his personal opposition to the site plan, citizens of Cuyahoga Falls voiced various concerns: that the development would cause crime and drug activity to escalate, that families with children would move in, and that the complex would attract a population similar to the one on Prange Drive, the City's only African-American neighborhood. See, e. g., 263 F. 3d, at 636–637; App. 98, 139, 191; Tr. 182–185, 270, 316. Nevertheless, because the plan met all municipal zoning requirements, the city council approved the project on April 1, 1996, through City Ordinance No. 48–1996.

On April 29, a group of citizens filed a formal petition with the City requesting that the ordinance be repealed or submitted to a popular vote. Pursuant to the charter, which provides that an ordinance challenged by a petition "shall [not] go into effect until approved by a majority" of voters, the filing stayed the implementation of the site plan. Art. 9, § 2, App. 15. On April 30, respondents sought an injunction against the petition in state court, arguing that the Ohio Constitution does not authorize popular referendums on administrative matters. On May 31, the Court of Common Pleas denied the injunction. Civ. No. 96–05–1701 (Summit County), App. to Pet. for Cert. 255a. A month later, respondents nonetheless requested building permits from the City in order to begin construction. On June 26, the city engineer rejected the request after being advised by the city law director that the permits "could not be issued because the site plan ordinance 'does not take effect' due to the petitions." 263 F. 3d, at 633.

In November 1996, the voters of Cuyahoga Falls passed the referendum, thus repealing Ordinance No. 48–1996. In

a joint stipulation, however, the parties agreed that the results of the election would not be certified until the litigation over the referendum was resolved. See Stipulation and Jointly Agreed upon Preliminary Injunction Order in No. 5:96 CV 1458 (ND Ohio, Nov. 25, 1996). In July 1998, the Ohio Supreme Court, having initially concluded that the referendum was proper, reversed itself and declared the referendum unconstitutional. 82 Ohio St. 3d 539, 697 N. E. 2d 181 (holding that the Ohio State Constitution authorizes referendums only in relation to legislative acts, not administrative acts, such as the site-plan ordinance). The City subsequently issued the building permits, and Buckeye commenced construction of Pleasant Meadows.

## B

In July 1996, with the state-court litigation still pending, respondents filed suit in federal court against the City and several city officials, seeking an injunction ordering the City to issue the building permits, as well as declaratory and monetary relief. Buckeye alleged that "in allowing a site plan approval ordinance to be submitted to the electors of Cuyahoga Falls through a referendum and in rejecting [its] application for building permits," the City and its officials violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as well as the Fair Housing Act, 42 U. S. C. § 3601. Complaint in No. 5:96 CV 1458 ¶ 1 (ND Ohio, July 5, 1996) (hereinafter Complaint). In June 1997, the District Court dismissed the case against the mayor in his individual capacity but denied the City's motion for summary judgment on the equal protection and due process claims, concluding that genuine issues of material fact existed as to both claims. 970 F. Supp. 1289, 1308 (ND Ohio 1997). After the Ohio Supreme Court declared the referendum invalid in 1998, thus reducing respondents' action to a claim for damages for the delay in construction, the City and its officials again moved for summary judgment. On November

19, 1999, the District Court granted the motion on all counts. Civ. No. 5:96 CV 1458, App. to Pet. for Cert. 35a.

The Court of Appeals for the Sixth Circuit reversed. As to respondents' equal protection claim, the court concluded that they had produced sufficient evidence to go to trial on the allegation that the City, by allowing the referendum petition to stay the implementation of the site plan, gave effect to the racial bias reflected in the public's opposition to the project. See 263 F. 3d, at 639. The court then held that even if respondents failed to prove intentional discrimination, they stated a valid claim under the Fair Housing Act on the theory that the City's actions had a disparate impact based on race and family status. See *id.*, at 640. Finally, the court concluded that a genuine issue of material fact existed as to whether the City, by denying respondents the benefit of the lawfully approved site plan, engaged in arbitrary and irrational government conduct in violation of substantive due process. *Id.*, at 644. We granted certiorari, 536 U. S. 938 (2002), and now reverse the constitutional holdings and vacate the Fair Housing Act holding.

## II

Respondents allege that by submitting the petition to the voters and refusing to issue building permits while the petition was pending, the City and its officials violated the Equal Protection Clause. See Complaint ¶ 41. Petitioners claim that the Sixth Circuit went astray by ascribing the motivations of a handful of citizens supportive of the referendum to the City. We agree with petitioners that respondents have failed to present sufficient evidence of an equal protection violation to survive summary judgment.

We have made clear that "[p]roof of racially discriminatory intent or purpose is required" to show a violation of the Equal Protection Clause. *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265 (1977) (citing *Washington* v. *Davis*, 426 U. S. 229 (1976)). In decid-

ing the equal protection question, the Sixth Circuit erred in relying on cases in which we have subjected enacted, discretionary measures to equal protection scrutiny and treated decisionmakers' statements as evidence of such intent. See 263 F. 3d, at 634–635 (citing *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 448 (1985); *Arlington Heights* v. *Metropolitan Housing Development Corp.*, *supra*, at 268; and *Hunter* v. *Erickson*, 393 U. S. 385, 392 (1969)). Because respondents claim injury from the referendum petitioning *process* and not from the referendum itself—which never went into effect—these cases are inapposite. Ultimately, neither of the official acts respondents challenge reflects the intent required to support equal protection liability.

First, in submitting the referendum petition to the voters, the City acted pursuant to the requirements of its charter, which sets out a facially neutral petitioning procedure. See Art. 9, § 2. By placing the referendum on the ballot, the City did not enact the referendum and therefore cannot be said to have given effect to voters' allegedly discriminatory motives for supporting the petition. Similarly, the city engineer, in refusing to issue the building permits while the referendum was still pending, performed a nondiscretionary, ministerial act. He acted in response to the city law director's instruction that the building permits "could not . . . issue" because the charter prohibited a challenged site-plan ordinance from going into effect until "approved by a majority of those voting thereon," App. 16. See 263 F. 3d, at 633. Respondents point to no evidence suggesting that these official acts were themselves motivated by racial animus. Respondents do not, for example, offer evidence that the City followed the obligations set forth in its charter *because of* the referendum's discriminatory purpose, or that city officials would have selectively refused to follow standard charter procedures in a different case.

Instead, to establish discriminatory intent, respondents and the Sixth Circuit both rely heavily on evidence of alleg-

edly discriminatory voter sentiment. See *id.*, at 635–637. But statements made by private individuals in the course of a citizen-driven petition drive, while sometimes relevant to equal protection analysis, see *supra,* at 194, do not, in and of themselves, constitute state action for the purposes of the Fourteenth Amendment. Cf. *Blum* v. *Yaretsky,* 457 U. S. 991, 1002–1003 (1982) (" '[T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States' " (quoting *Shelley* v. *Kraemer,* 334 U. S. 1, 13 (1948))). Moreover, respondents put forth no evidence that the "private motives [that] triggered" the referendum drive "can fairly be attributed to the State." *Blum* v. *Yaretsky, supra,* at 1004.

In fact, by adhering to charter procedures, city officials enabled public debate on the referendum to take place, thus advancing significant First Amendment interests. In assessing the referendum as a "basic instrument of democratic government," *Eastlake* v. *Forest City Enterprises, Inc.,* 426 U. S. 668, 679 (1976), we have observed that "[p]rovisions for referendums demonstrate devotion to democracy, not to bias, discrimination, or prejudice," *James* v. *Valtierra,* 402 U. S. 137, 141 (1971). And our well established First Amendment admonition that "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable," *Texas* v. *Johnson,* 491 U. S. 397, 414 (1989), dovetails with the notion that all citizens, regardless of the content of their ideas, have the right to petition their government. Cf. *Meyer* v. *Grant,* 486 U. S. 414, 421–422 (1988) (describing the circulation of an initiative petition as " 'core political speech' "); *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972) ("[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views"). Again, statements made by decisionmakers or referendum sponsors during deliberation over a

referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative. See, *e. g., Washington* v. *Seattle School Dist. No. 1*, 458 U. S. 457, 471 (1982) (considering statements of initiative sponsors in subjecting enacted referendum to equal protection scrutiny); *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S., at 268. But respondents do not challenge an enacted referendum.

In their brief to this Court, respondents offer an alternative theory of equal protection liability: that city officials, including the mayor, acted in concert with private citizens to prevent Pleasant Meadows from being built because of the race and family status of its likely residents. See Brief for Respondents 12–26; Tr. of Oral Arg. 33–34, 36–40, 43. Respondents allege, among other things, that the city law director prompted disgruntled voters to file the petition, that the city council intentionally delayed its deliberations to thwart the development, and that the mayor stoked the public opposition. See Brief for Respondents 17. Not only did the courts below not directly address this theory of liability, but respondents also appear to have disavowed this claim at oral argument, focusing instead on the denial of the permits. See Tr. of Oral Arg. 37–38.

What is more, respondents never articulated a cognizable legal claim on these grounds. Respondents fail to show that city officials exercised any power over voters' decision-making during the drive, much less the kind of "coercive power" either "overt or covert" that would render the voters' actions and statements, for all intents and purposes, state action. *Blum* v. *Yaretsky*, 457 U. S., at 1004. Nor, as noted above, do respondents show that the voters' sentiments can be attributed in any way to the state actors against which it has brought suit. See *ibid.* Indeed, in finding a genuine issue of material fact with regard to intent, the Sixth Circuit relied almost entirely on apparently independent statements by private citizens. See 263 F. 3d, at

635–637. And in dismissing the claim against the mayor in his individual capacity, the District Court found no evidence that he orchestrated the referendum. See 970 F. Supp., at 1321. Respondents thus fail to present an equal protection claim sufficient to survive summary judgment.

### III

In evaluating respondents' substantive due process claim, the Sixth Circuit found, as a threshold matter, that respondents had a legitimate claim of entitlement to the building permits, and therefore a property interest in those permits, in light of the city council's approval of the site plan. See 263 F. 3d, at 642. The court then held that respondents had presented sufficient evidence to survive summary judgment on their claim that the City engaged in arbitrary conduct by denying respondents the benefit of the plan. *Id.*, at 644. Both in their complaint and before this Court, respondents contend that the City violated substantive due process, not only for the reason articulated by the Sixth Circuit, but also on the grounds that the City's submission of an administrative land-use determination to the charter's referendum procedures constituted *per se* arbitrary conduct. See Complaint ¶¶ 39, 43; Brief for Respondents 32–49. We find no merit in either claim.

We need not decide whether respondents possessed a property interest in the building permits, because the city engineer's refusal to issue the permits while the petition was pending in no sense constituted egregious or arbitrary government conduct. See *County of Sacramento* v. *Lewis*, 523 U. S. 833, 846 (1998) (noting that in our evaluations of "abusive executive action," we have held that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'"). In light of the charter's provision that "[n]o such ordinance [challenged by a petition] shall go into effect until approved by a majority of those voting

thereon," Art. 9, § 2, App. 15, the law director's instruction to the engineer to not issue the permits represented an eminently rational directive. Indeed, the site plan, by law, could not be implemented until the voters passed on the referendum.

Respondents' second theory of liability has no basis in our precedent. As a matter of federal constitutional law, we have rejected the distinction that respondents ask us to draw, and that the Ohio Supreme Court drew as a matter of state law, between legislative and administrative referendums. In *Eastlake* v. *Forest City Enterprises, Inc.*, 426 U. S., at 672, 675, we made clear that because all power stems from the people, "[a] referendum cannot . . . be characterized as a delegation of power," unlawful unless accompanied by "discernible standards." The people retain the power to govern through referendum "'with respect to any matter, legislative or administrative, within the realm of local affairs.'" *Id.*, at 674, n. 9. Cf. *James* v. *Valtierra*, 402 U. S. 137. Though the "substantive result" of a referendum may be invalid if it is "arbitrary and capricious," *Eastlake* v. *Forest City Enterprises, supra*, at 676, respondents do not challenge the referendum itself. The subjection of the site-plan ordinance to the City's referendum process, regardless of whether that ordinance reflected an administrative or legislative decision, did not constitute *per se* arbitrary government conduct in violation of due process.

## IV

For the reasons detailed above, we reverse the Sixth Circuit's judgment with regard to respondents' equal protection and substantive due process claims. The Sixth Circuit also held that respondents' disparate impact claim under the Fair Housing Act could proceed to trial, 263 F. 3d, at 641, but respondents have now abandoned the claim. See Brief for Respondents 31. We therefore vacate the Sixth Circuit's

disparate impact holding and remand with instructions to dismiss, with prejudice, the relevant portion of the complaint. See *Deakins* v. *Monaghan*, 484 U. S. 193, 200 (1988).

The judgment of the United States Court of Appeals for the Sixth Circuit is, accordingly, reversed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I join the Court's opinion, including Part III, which concludes that respondents' assertions of arbitrary government conduct must be rejected. I write separately to observe that, *even if* there had been arbitrary government conduct, that would not have established the substantive-due-process violation that respondents claim.

It would be absurd to think that all "arbitrary and capricious" government action violates substantive due process—even, for example, the arbitrary and capricious cancellation of a public employee's parking privileges. The judicially created substantive component of the Due Process Clause protects, we have said, certain "fundamental liberty interest[s]" from deprivation by the government, unless the infringement is narrowly tailored to serve a compelling state interest. *Washington* v. *Glucksberg,* 521 U. S. 702, 721 (1997). Freedom from delay in receiving a building permit is not among these "fundamental liberty interests." To the contrary, the Takings Clause allows government *confiscation* of private property so long as it is taken for a public use and just compensation is paid; mere *regulation* of land use need not be "narrowly tailored" to effectuate a "compelling state interest." Those who claim "arbitrary" deprivations of nonfundamental liberty interests must look to the Equal Protection Clause, and *Graham* v. *Connor,* 490 U. S. 386, 395 (1989), precludes the use of "'substantive due proc-

ess'" analysis when a more specific constitutional provision governs.

As for respondents' assertion that referendums may not be used to decide whether low-income housing may be built on their land: that is not a substantive-due-process claim, but rather a challenge to the *procedures* by which respondents were deprived of their alleged liberty interest in building on their land. There is nothing procedurally defective about conditioning the right to build low-income housing on the outcome of a popular referendum, cf. *James* v. *Valtierra*, 402 U. S. 137 (1971), and the delay in issuing the permit was prescribed by a duly enacted provision of the Cuyahoga Falls City Charter (Art. 9, § 2), which surely constitutes "due process of law," see *Connecticut Dept. of Public Safety* v. *Doe*, *ante*, p. 8 (SCALIA, J., concurring).

With these observations, I join the Court's opinion.