In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-2811

KIRK CHRZANOWSKI,

*Plaintiff-Appellant,*

*v.*

LOUIS A. BIANCHI, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 12 C 50020 — **Philip G. Reinhard**, *Judge.*

ARGUED APRIL 5, 2013 — DECIDED AUGUST 2, 2013

Before EASTERBROOK, *Chief Judge*, and FLAUM and WOOD,
*Circuit Judges*.

WOOD, *Circuit Judge*. From January 2006 until he lost his
job in December 2011, Kirk Chrzanowski was an assistant
state's attorney in the McHenry County State's Attorney's
Office. Problems arose for Chrzanowski in early 2011, when
a special prosecutor began investigating suspected
wrongdoing by Chrzanowski's boss, McHenry County
State's Attorney Louis Bianchi. Bianchi allegedly had

improperly influenced the handling of cases involving his relatives and political allies. Under command of a subpoena, Chrzanowski testified before the grand jury, and later, after receiving another subpoena, he testified at Bianchi's trial. A few months after the trial, Chrzanowski was called into Bianchi's office, interrogated about his testimony by Bianchi and another prosecutor, Michael Combs, and fired. Chrzanowski believes that this was "in retaliation for his truthful testimony." He filed suit a month later, alleging that Bianchi and Combs violated his rights under the First Amendment and various state statutes.

The defendants moved to dismiss Chrzanowski's § 1983 claims, arguing that the First Amendment's protections do not apply to any of his testimony because his statements were given "pursuant to [his] official duties" as a public employee. See *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The district court agreed, holding that Chrzanowski had not presented a valid constitutional claim; in the alternative, the court held that the defendants were entitled to qualified immunity, since any First Amendment protections that might have attached to his testimony were not "clearly established" at the time. We reverse.

**I**

Our analysis relies on the facts contained in Chrzanowski's complaint, which at this stage we accept as true and construe in Chrzanowski's favor. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009).

Chrzanowksi began working in the McHenry County State's Attorney's Office as an assistant state's attorney in January 2006. Initially he was assigned to the Office's

misdemeanor division, but eventually he assumed responsibility for prosecuting more serious drug offenses and other felonies. He received positive performance reviews and raises in 2006, 2007, 2008 (twice), 2009 and 2010.

In early 2011, Chrzanowksi received a subpoena to testify before a grand jury. He complied and gave sworn testimony concerning allegations that Bianchi had improperly influenced a negotiated plea in a case for which Chrzanowski was principally responsible. On February 24, 2011, the grand jury returned an indictment against Bianchi on charges of official misconduct in violation of 720 ILCS 5/33-3(b). Chrzanowski was listed as a potential trial witness on April 6, 2011, and he received a trial subpoena two months later. He testified in the prosecution's case-in-chief on August 1, 2011.

From the outset, Bianchi and his allies were concerned by Chrzanowski's cooperation with the investigation. Upon learning of the grand jury subpoena, Ron Salgado, the chief investigator in the McHenry County State's Attorney's Office (and a friend and political ally of Bianchi), tried to speak with Chrzanowski. Chrzanowski avoided his calls. Terry Ekl, Bianchi's defense counsel, also tried to contact Chrzanowski after the special prosecutor identified Chrzanowski as a potential trial witness, but again Chrzanowski ignored requests to discuss the Bianchi investigation. On cross-examination at Bianchi's trial, Ekl pointedly brought up Chrzanowski's refusal to discuss the case before the trial:

> Q: And you didn't feel that you owed your boss any obligation to talk to his lawyer before this trial, right?

A: My only obligation is to tell the truth here, sir.

Over the same period, Bianchi began placing memoranda and notes in Chrzanowski's personnel file; these notes bore little relation to Chrzanowski's work performance. For instance, on June 6, 2011, Bianchi placed a negative report in Chrzanowski's file because Chrzanowski failed to introduce Bianchi to "two college females" who were interning in the office. "He never would have thought of introducing me to them had I not stopped him and made a point of it," Bianchi wrote. Chrzanowski was unaware of these additions to his personnel file and did not have an opportunity to contest them.

On December 2, 2011, Chrzanowski was summoned from his regular courtroom duties to Bianchi's office. There, Bianchi and Combs "confronted and interrogated" Chrzanowski about his grand jury and trial testimony. They presented him with transcripts of the proceedings and eventually Bianchi asked for Chrzanowski's resignation. When Chrzanowski refused, Bianchi told him, "You're terminated. Get out." Chrzanowski alleges that he was "fir[ed] in retaliation for his truthful testimony against … Bianchi."

Chrzanowski responded to these events by filing suit in federal court, asserting claims against Bianchi and Combs pursuant to 42 U.S.C. § 1983 and state law. The defendants moved to dismiss the complaint in its entirety, arguing that Chrzanowski failed to state a valid First Amendment claim and that his state counts should be dismissed once the federal claim disappeared. Relying heavily on this court's decision in *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008), the district court concluded that, when testifying against Bianchi, Chrzanowski was "a public employee … speak[ing]

pursuant to [his] official duties," and not "a private citizen [speaking] on a matter of public concern." The First Amendment offers no protection to "expressions [public] employees make pursuant to their professional duties," *Garcetti*, 547 U.S. at 426, and accordingly, the district court dismissed the § 1983 claim under Federal Rule of Civil Procedure 12(b)(6). In the alternative, the court held that "if the conclusion that there was no constitutional violation is incorrect, it cannot be said that the right was so clearly established that defendants cannot avail themselves of qualified immunity." The court then granted Chrzanowski's request voluntarily to dismiss the remaining state law claims. This appeal followed.

## II

In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. In that case, a deputy district attorney alleged that supervisors had penalized him for writing an internal "disposition memorandum" that highlighted police misconduct in a pending criminal prosecution. *Id*. at 420. The plaintiff also asserted that he was punished for speaking out about the case in other settings: for instance, discussing the matter with his supervisors, testifying truthfully at a hearing in which the defendant challenged the validity of a search warrant, and delivering a speech about the case at a bar meeting. The Court limited its opinion to the question whether the memorandum warranted First Amendment protection. The dispositive fact, it explained, was that writ-

ing such "disposition memoranda" was exactly what the plaintiff was employed to do in his capacity as a "calendar deputy." *Id.* at 421. The Court highlighted the fact that "the parties … [did] not dispute that Ceballos wrote his disposition memo pursuant to his employment duties." *Id.* at 424. Disciplinary action on the basis of such speech does not offend the First Amendment because "[r]estricting employee speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22.

Although the *Garcetti* Court chose not to "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," *id.* at 424, it did provide guidance on the subject. Public employee speech does not lose First Amendment protection because it concerns the subject matter of the employee's job. *Id.* at 421. To the contrary, the Court reaffirmed that public employees are often "the members of a community most likely to have informed and definite opinions" on matters of public concern, and that it remains "essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.* (quoting *Pickering v. Bd. of Ed. of Township High School Dist. 205, Will Cnty.*, 391 U.S. 563, 572 (1968)). Likewise, public employees' speech is not subject to restriction simply because it occurs inside the office, since "[m]any citizens do much of their talking inside their respective workplaces." *Id.* at 420-421. In other words, speech does not "owe[] its existence to a public employee's professional responsibilities" within the meaning of *Garcetti* simply because public employment provides a factual predicate for the expressive activity; rather, *Garcetti* governs

speech that is made "pursuant to official duties" in the sense that it is "government employees' work product" that has been "commissioned or created" by the employer. *Id.* at 422 (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).

In assessing whether a public employee is speaking as an employee or as a citizen, the Court emphasized that "[t]he proper inquiry" must be "a practical one." *Id.* at 424. The dissenting Justices voiced concern that public employers might begin "defining [employees'] job responsibilities expansively" in an effort to remove protected speech from the First Amendment's purview (*e.g.*, "investing [employees] with a general obligation to ensure sound administration" of public institutions), *id.* at 431 n.2 (Souter, J., dissenting), but the majority forcefully rejected "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. *Id.* at 424. Instead, the Court explained that we must ask whether the speech is part of the employee's "daily professional activities." *Id.* at 422; see also *Ceballos v. Garcetti*, 361 F.3d 1168, 1189 (9th Cir. 2004) (O'Scannlain, J., specially concurring) ("[W]hen public employees speak in the course of carrying out their *routine*, required employment obligations, they have no personal interest in the content of that speech that gives rise to a First Amendment right.") (emphasis added).

In *Fairley v. Fermaint,* 471 F.3d 826 (7th Cir. 2006) (*Fairley I*), rehearing denied 482 F.3d 897 (7th Cir. 2007) (*Fairley II*), we had occasion to consider how *Garcetti* applies to testimony that state employees give in lawsuits filed by third parties, as contrasted with statements made as part of their duties at work. There, we held that "[a]ssistance to prisoners

and their lawyers in litigation is not part of a guard's official duties." *Fairley I*, 471 F.3d at 829; *Fairley v. Andrews*, 578 F.3d 518, 524-25 (7th Cir. 2009) (*Fairley III*). Indeed, we thought this principle so well established that we denied qualified immunity to the defendants, taking the facts in the light most favorable to the plaintiffs. *Fairley II*, 482 F.3d at 902-03. In language that applies equally to this case, we observed in *Fairley III* that "[e]ven if offering (adverse) testimony is a job duty, courts rather than employers are entitled to supervise the process. A government cannot tell its employees what to say in court, see 18 U.S.C. § 1512, nor can it prevent them from testifying against it." 578 F.3d at 525.

With these considerations in mind, we turn to the speech at issue in Chrzanowski's complaint.

### III

Chrzanowski alleges that he was interrogated and dismissed "in retaliation for his truthful [grand jury and trial] testimony." The district court concluded that his testimony was "part of his official duties and responsibilities as an assistant state's attorney" because "an assistant state's attorney [is] obligated to pursue all criminal offenses, even those allegedly perpetrated by his supervisors." See 55 ILCS 5/3-9005(a)(1) ("The duty of each State's attorney shall be … to commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for his county, in which the people of the State or county may be concerned."). Since it was "part of [Chrzanowski's] job to serve the people of McHenry County in the proper administration of justice …, it was part of those duties as a prosecutor that obligated [him] to cooperate in the pursuit of any criminal charges involving his supervisors, including

testifying as a material witness if necessary." In relevant respects, the district court found this case to be a replica of *Garcetti*: "there can be no question …, after *Gacretti* [*sic*], that [Chrzanowski] was acting and speaking in his role as prosecutor as opposed to a private citizen when he testified."

This conclusion follows only if one places dispositive weight on an "excessively broad job description[]" without assessing, as a practical matter, what "task[s] [Chrzanowski] was paid to perform" in the course of his "daily profession-al activities." *Id.* at 422. This is precisely what the *Garcetti* Court instructed us not to do when evaluating employee-speech claims. Indeed, the Court expressly rejected the ar-gument that job descriptions such as those at issue here (*e.g.*, "a general obligation to ensure sound administration" of public institutions) could place otherwise protected speech outside the ambit of the First Amendment. Instead, we must ask whether the public employee spoke "because that is part of what [the public employee] was employed to do." *Id.* at 421.

So what is an assistant state's attorney "assigned to a felony trial courtroom" employed to do? Prosecute felonies. In the course of that work, Chrzanowski presumably engaged in a wide range of expressive activity: the work of a prosecutor entails making opening and closing statements to juries, filing reports with supervisors, perhaps speaking to reporters after a high-profile verdict. It is even possible that in the course of his employment Chrzanowski testified before a grand jury as an "investigating witness," though Illinois courts have emphasized that "this practice could be subject to abuse and is not encouraged." *People v. Bissonnette*,

313 N.E.2d 646, 649 (Ill. Ct. App. 1974). But appearing as an "investigating witness" is a far cry from giving eyewitness testimony under subpoena regarding potential criminal wrongdoing that Chrzanowski happened to observe while on the job. The McHenry County State's Attorney's Office does not pay Chrzanowski to witness crimes and then testify about them; it pays him to prosecute crimes. And when there is a potential conflict of interest, as with an investigation into wrongdoing by other members of the McHenry County State's Attorney's Office, those prosecutorial responsibilities are assigned to a special prosecutor with a healthy measure of independence. See 55 ILCS 5/3-9008. Although there may be cases where a judge will have an "imperfect understanding of the precise duties associated with a public sector job when all he or she knows is a job title," *Huppert v. City of Pittsburg*, 574 F.3d 696, 719 (9th Cir. 2009) (Fletcher, J., dissenting), thus requiring further development of the factual record before a determination can be made, this case presents no such difficulty.

To be sure, Chrzanowski was called as a witness to discuss his employment with the McHenry County State's Attorney's Office, and his testimony focused exclusively on "allegation[s] that … Bianchi had improperly influenced and/or arranged a negotiated plea in a case for which [Chrzanowski] was principally responsible." But the fact that his testimony "concern[ed] the subject matter of [his] employment" does not mean that Chrzanowski's speech "owe[d] its existence" to his official responsibilities as the *Garcetti* Court used the phrase. 547 U.S. at 421. His speech was no different from that of a schoolteacher who writes a newspaper editorial criticizing the School Board and

superintendant, *Pickering*, 391 U.S. at 566, or of an assistant district attorney who speaks with her co-workers about potential corruption within the District Attorney's office, *Connick v. Myers,* 461 U.S. 138, 149 (1983). See also *Garcetti*, 547 U.S. at 424 (affirming that the "statements or complaints … at issue in cases like *Pickering* and *Connick* [were] made outside the duties of employment."). Like Chrzanowski, the plaintiffs in both of these cases were disciplined for sharing information learned and opinions formed in the course of their public employment. Chrzanowski worked in the criminal justice system and his speech occurred in the course of judicial proceedings. Nonetheless, when he spoke out about potential or actual wrongdoing on the part of his supervisors, he too was speaking "outside the duties of employment."

## IV

The *Fairley* line of cases provides an independent reason why Chrzanowski's case is not governed by *Garcetti*: the speech for which Chrzanowski was penalized was given under subpoena, both before the grand jury and at trial, in an action filed by a third party. The district court found this fact irrelevant, because "[t]he subpoena was merely a proce-dural mechanism to obtain his presence at the grand jury and trial and did not detract from his overarching duty to cooperate in the criminal prosecution as an assistant state's attorney and public employee." As we already have ex-plained, this focus on Chrzanowski's general professional obligations is misguided; we are to look only at whether par-ticular speech is "made pursuant to official duties" (and, thus, not "as a citizen") in a more limited sense. When a public employee gives testimony pursuant to a subpoena,

fulfilling the "general obligation of [every] citizen to appear before a grand jury or at trial," *Branzburg v. Hayes*, 408 U.S. 665, 686 (1972), he speaks "as a citizen" for First Amendment purposes. See also *Fairley III,* 578 F.3d at 524-25.

Careful attention to the reasoning behind *Garcetti* shows why this is so. Typical public employee speech cases require a "balanc[ing] between the interests of the [public employee] and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568; see also *Garcetti*, 547 U.S. at 417-20. The general public also shares an important interest in the government employee's ability to speak freely, since public employees contribute to civil discussion by adding their well-informed views. *Garcetti*, 547 U.S. at 419; *id.* at 420 ("The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.") (quoting *San Diego v. Roe*, 543 U.S. 77, 82 (2004) (*per curiam*)). Public employee speech "made pursuant to official duties" has a different character, the *Garcetti* Court explained. First, restrictions on such speech "do not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 422. Someone hired to be the governor's spokesperson is paid to articulate and disseminate the governor's views, not to offer her own opinions on the topics of the day. Second, restrictions on such speech in no way undermine "the potential societal value of employee speech," since employees "retain the prospect of constitutional protection for their contributions to the civic discourse." *Id*. Finally, a contrary approach to such speech would "commit state and federal courts to a new, permanent, and intrusive role, mandating oversight of communications between and among government

employees and their superiors in the course of official business," and would "displace[] … managerial discretion." *Id.* at 423.

This reasoning is not applicable to situations in which a public employee—prosecutor, police officer, or anyone else—is compelled to give testimony pursuant to a subpoena. First, the individual person has a strong interest in complying with the demands of a subpoena: apart from whatever desire a public employee might have to assist in the administration of justice, failure to comply with a subpoena can result in lengthy incarceration. See, *e.g.*, Kim Murphy, *Two Freed in Anarchist Case*, L.A. TIMES, Mar. 1, 2013, at A8 ("[t]wo activists … held for more than five months, mostly in solitary confinement[,] to pressure them to testify about suspected anarchists"); Jesse McKinley, *8-Month Jail Term Ends as Maker of Video Turns Over a Copy*, N.Y. TIMES, Apr. 4, 2007, at A9 (freelance journalist held for 224 days for "refusing to turn over a videotape" of demonstration). It would be strange to have a constitutional rule that prohibits the State from conditioning public employment on a basis that restricts an employee's right to speak freely, *Connick*, 461 U.S. at 142, yet allows the State to condition public employment on an employee's willingness to impede the judicial process by remaining mute. Indeed, as we held in *Fairley III*, a government has no right to tell its employees what to say in court. 578 F.3d at 525.

The public also has a substantial interest in hearing such speech. Indeed, the extraordinary power to jail those who refuse to cooperate with grand juries is rooted in the "longstanding principle that 'the public … has a right to every man's evidence.'" *Branzburg*, 408 U.S. at 688 (quoting

*United States v. Bryan*, 339 U.S. 323, 331 (1950)). Public-employee speech often provides society with information that is essential for democratic self-governance:

> [A]s the state grows more layered and impacts lives more profoundly, it seems inimical to First Amendment principles to treat too summarily those who bring, often at some personal risk, its operations into public view. It is vital to the health of our polity that the functioning of the ever more complex and powerful machinery of government not become democracy's dark lagoon.

*Andrew v. Clark*, 561 F.3d 261, 273 (4th Cir. 2009) (Wilkinson, J., concurring). Unlike restrictions on speech "made pursuant to official duties," threats or punishment for subpoenaed testimony undoubtedly chill valuable "contributions to the civic discourse" in significant and pernicious ways.

Finally, it cannot be said that affording Chrzanowski's speech some level of constitutional protection would commit the courts to an "intrusive role, mandating oversight of communications between and among government employees and their superiors in the course of official business." *Id.* at 423. As *Garcetti* explained, "sound principles of federalism and the separation of powers" caution against judicial intervention when an employee's expressive activity is truly "commissioned or created" by a public employer. *Id.* at 423, 422. But if the defendants here had some legitimate managerial interest in dissuading Chrzanowski from testifying truthfully pursuant to a subpoena, we cannot imagine what it might be. In short, none of the rationales justifying the rule announced in *Garcetti* applies here.

**V**

The district court went on to hold that "even if the conclusion that there was no constitutional violation is incorrect, it cannot be said that the right was so clearly established that defendants cannot avail themselves of qualified immunity." To qualify as "clearly established," the right must be "particularized" in the sense that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Given our rationale in the *Fairley* line of cases, we have little trouble concluding that reasonable officials in the defendants' shoes would understand that retaliating against Chrzanowski for giving truthful grand jury and trial testimony would violate the First Amendment.

The defendants maintain that this court's decision in *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008), cast some doubt on whether official testimony could be entitled to First Amendment protection, but this argument misapprehends the reasoning and scope of that opinion. In *Tamayo*, the former Interim Administrator of the Illinois Gaming Board (IGB) alleged (among other things) that she was retaliated against in response to her public testimony before the Illinois House Gaming Committee. *Id.* at 1078-80, 1091. As we explained, this particular form of testimony did not qualify for First Amendment protections:

An employee with significant and comprehensive responsibility for policy formation and implementation certainly has greater responsibility to speak to a wider audience on behalf of the governmental unit. When, as here, a complaint states that the senior administra-

tor of an agency testified before a committee of the legislature charged with oversight of the agency about allegedly improper political influence over that agency, the natural reading of such an allegation is that the official, in so informing the legislators, was discharging the responsibilities of her office, not appearing as "Jane Q. Public."

*Id.* at 1091-92 (citations omitted). Although we also noted that Tamayo "had a duty to see that the law was administered properly" and "a duty to bring alleged wrongdoing within her agency to the attention of the relevant public authorities," *id.* at 1091, our holding did not rest on these broad and general characterizations of Tamayo's "official responsibilities." Rather, we explained that Tamayo's testimony did not receive First Amendment protection because, as a practical matter, she was expected to engage in such speech in the regular course of her employment. Testifying before the House Gaming Committee was an important part of the job of a high-ranking official like Tamayo; the same was not true for Chrzanowski.

Our opinion in *Morales v. Jones*, 494 F.3d 590 (7th Cir. 2007), has much greater bearing on this case. There, a Milwaukee police officer alleged that he was transferred to night-shift patrol duty after being deposed pursuant to a subpoena in a civil suit brought by a fellow officer against the Chief of Police. *Id.* at 598. We concluded that "being deposed in a civil suit pursuant to a subpoena was unquestionably not one of Morales' job duties because it was not part of what he was employed to do." *Id.*; accord *Karl v. City of Mountlake Terrace*, 378 F.3d 1062 (9th Cir. 2012); *Reilly v. City of Atlantic City*, 532 F.3d 216, 220 (3d Cir. 2008). But see

*Huppert*, 574 F.3d at 707. Like Chrzanowski, Morales undoubtedly had a professional obligation (not to mention a personal obligation) to comply with the subpoena, but this did not somehow convert his deposition testimony into speech "made pursuant to official duties." Defendants point out that *Morales* involved testimony in the civil context, whereas this case involves testimony in criminal proceedings, but this is a distinction without a difference: providing eyewitness testimony regarding potential wrongdoing, civil or criminal, was never "part of what [Chrzanowski] was employed to do." Chrzanowski's rights were clearly established at all relevant times.

## VI

We conclude by emphasizing that we express no opinion on the merits of Chrzanowski's claims. We hold only that at this preliminary stage, he has stated a valid First Amendment claim. We REVERSE the district court's judgment and REMAND for further proceedings consistent with this opinion.