In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――

No. 13-2633

CENERGY-GLENMORE WIND FARM #1, LLC,

*Plaintiff-Appellant*,

*v.*

TOWN OF GLENMORE,

*Defendant-Appellee*.

―――――――――

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 12-C-1166 — **William C. Griesbach**, *Chief Judge*.

―――――――――

ARGUED APRIL 1, 2014 — DECIDED AUGUST 7, 2014

―――――――――

Before TINDER and HAMILTON, *Circuit Judges*, and
KAPALA, *District Judge*.[*]

HAMILTON, *Circuit Judge*. Plaintiff CEnergy-Glenmore
Windfarm #1, LLC, obtained a conditional use permit from
the town of Glenmore, Wisconsin, to develop a wind farm
there. But the company did not obtain required building
permits in time to take advantage of a lucrative opportunity

―――――――――

[*] The Honorable Frederick J. Kapala, of the United States District Court
for the Northern District of Illinois, sitting by designation.

to sell electricity generated by wind turbines to a Wisconsin power company. CEnergy then filed this lawsuit against Glenmore claiming a denial of its right under the Fourteenth Amendment to substantive due process and a violation of the town's state law obligation to deal in good faith. The district court dismissed the due process claim for failure to state a claim upon which relief can be granted and declined to retain jurisdiction over the supplemental state law claim. CEnergy has appealed. We affirm the district court's judgment.

I.   *Factual and Procedural Background*

On appeal from the grant of a Rule 12(b)(6) motion to dismiss, we must accept the facts alleged in the plaintiff's complaint as true. See *Chrzanowski v. Bianchi*, 725 F.3d 734, 736 (7th Cir. 2013). CEnergy alleges that Prelude, a company whose assets it later purchased, contracted in 2007 with a family in Glenmore to build a wind farm on the family's property. Prelude also obtained a conditional use permit from Glenmore to develop the farm.

Roughly two years later, Prelude entered into a power purchase agreement with the Wisconsin Public Service Corporation (WPS) to sell wind turbine-generated electricity for 20 years at specified rates. The agreement was binding on WPS only if Prelude obtained all necessary permits and satisfied various other requirements by March 1, 2011.

Prelude learned in September 2010 that before construction could begin, it would need to obtain a building permit for each of the seven planned wind turbines. The company tried to submit applications for the permits to the Town Board, Glenmore's legislative body, but the Board refused to

accept the applications unless the company provided additional information about the project.

By December 31, 2010, Prelude provided the Board with all requested information and told the Chair of the Board that the building permits would need to be approved by March 1, 2011, for the power purchase agreement with WPS to take effect. Without the power purchase agreement, Prelude told the Chair, the wind farm project would not be feasible because the energy market had changed substantially since the execution of the agreement with WPS. Also in December 2010, CEnergy agreed to purchase Prelude's assets, including the right to develop the wind farm. The sale closed in February 2011, on the eve of the WPS contract deadline.

In the meantime, public sentiment in Glenmore had turned decidedly against the wind farm project, as the Town Board well knew. Angry citizens had gathered at the Board's public meetings in January and February 2011 to oppose the plan. Unbeknownst to CEnergy, the Chair of the Board was receiving "threats to his physical safety should he approve the wind turbine project."

Although CEnergy had asked the Town Board to take up the issue of the building permits at both the January and February meetings, the Board did not do so, ostensibly because the town's attorney needed more time to review the information Prelude had submitted in December 2010. CEnergy contends that the Board members actually avoided taking up the issue "because of threats made to the physical safety of those officials by a mob of citizens opposing the project."

The Town Board "finally allowed CEnergy to complete and submit" applications for the building permits on March 1, 2011, and considered the applications at a meeting on March 7. At that meeting, the Board voted to grant the permits and then adjourned. But citizens in attendance became "accusatory and threatening" toward Board members and other town officials. The Chair reopened the meeting in response to the clamor. After further discussion, the Board voted to rescind the grant of the permits. A little over a week later, the Board held a special meeting and again reversed course, voting to nullify the actions it had taken after adjournment on March 7, thus reinstating the earlier vote in favor of granting the permits. The permits still were not actually issued, however, because the attorney for Glenmore contended that the applications were still missing crucial information.

As it turned out, even the initial vote on March 7 had come too late to save the wind farm project. WPS, perhaps pleased to escape from what had become for it an unprofitable deal, had sent CEnergy a letter on March 4 backing out of the power purchase agreement. As a principal reason, WPS cited CEnergy's failure to obtain the necessary permits by March 1.

After learning that the deal with WPS could not be salvaged, CEnergy filed this suit claiming that Glenmore deprived it of property without substantive due process of law when the Town Board delayed granting the building permits. In support of this claim, CEnergy alleges in its complaint that it had "vested property rights granted to it in the CUP [conditional use permit] and the requested building permits." The Town Board's decision to take no action on the

building permits "at least until after March 1" was meant to thwart the wind farm project, making the decision "an arbitrary and egregious abuse of [the Board's] authority" that "shock[s] the conscience" and cost CEnergy a contract worth more than $7 million in profits.

The district court concluded for two reasons that CEnergy did not state a viable substantive due process claim. First, the court explained, the Town Board's decision to delay action on the building permit applications in the face of strong public opposition did not "shock the conscience" as required to state a substantive due process claim. Second, CEnergy did not use available state law mechanisms for forcing action on its permit applications. Specifically, CEnergy did not pursue building permits under a local ordinance that governs the building-permit application process, nor did CEnergy ask a state court for a writ of mandamus to force action on its requests for building permits. This circuit has long held that a plaintiff who fails to pursue available state law remedies in the land-use context has no substantive due process claim.

II. *Analysis*

We review *de novo* the district court's decision to grant Glenmore's Rule 12(b)(6) motion to dismiss, construing the complaint in the light most favorable to the non-moving party—CEnergy—and accepting the factual allegations in the complaint as true. See, e.g., *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). We note at the outset, however, that federal courts, as we have explained time and again, are not zoning boards of appeal. See, e.g., *General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008); *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d

277, 283 (7th Cir. 2003); *Centres, Inc. v. Town of Brookfield*, 148 F.3d 699, 704 (7th Cir. 1998); *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 165 (7th Cir. 1994); *Polenz v. Parrott*, 883 F.2d 551, 558 (7th Cir. 1989). State and local land-use decisions are entitled to great deference when constitutional claims are raised in federal court.

Successful constitutional challenges to state and local land-use decisions generally rely on the takings clause of the Fifth Amendment (as incorporated by the Fourteenth) or the equal protection clause of the Fourteenth Amendment. See, e.g., *Koontz v. St. Johns River Water Management Dist.*, 133 S. Ct. 2586, 2599–2600 (2013) (takings clause violated by conditioning approval of land-use permit on monetary exaction that lacked nexus to proposed project); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448–50 (1985) (requirement that group home for the mentally disabled obtain a special permit violated equal protection clause). But the Supreme Court has acknowledged at least the theoretical possibility that a land-use decision—if it was "arbitrary in the constitutional sense" and deprived the plaintiff of property—could constitute a deprivation of property without substantive due process of law. See *City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188, 198–99 (2003) (rejecting substantive due process claim based on delay in issuance of building permits because delay was "eminently rational" rather than arbitrary). We also have acknowledged that possibility, see *Polenz*, 883 F.2d at 558 (collecting cases), though like the Supreme Court we have never definitively concluded that any land-use decision actually amounted to a deprivation of property without substantive due process. One reason that substantive due process is of questionable relevance in this area is that the due process clause's proce-

dural guarantees and the rights protected by the equal protection and takings clauses leave little if any ground uncovered.

Whether CEnergy has even identified a property interest in the building permits it sought, its use of the land it leased, or its agreement with WPS is questionable, but we need not decide those issues. Like the district court we conclude that CEnergy's substantive due process claim fails because the Board's actions were not arbitrary in the constitutional sense and because CEnergy did not seek recourse under state law as required by a long line of cases in this circuit. We need not address other potential problems with the company's claim.

On the issue of arbitrariness, we have said that a land-use decision must "shock the conscience" to run afoul of the Constitution. *Bettendorf v. St. Croix County*, 631 F.3d 421, 426 (7th Cir. 2011). We also have suggested that the action must have been "arbitrary and capricious," *Centres*, 148 F.3d at 704, or "random and irrational," *General Auto Service Station*, 526 F.3d at 1000. In yet another formulation, the Supreme Court has explained that a land-use decision must be arbitrary to the point of being "egregious" to implicate substantive due process. *Cuyahoga Falls*, 538 U.S. at 198. These standards should not be viewed as distinct, at least in the land-use context. In *Cuyahoga Falls*, the Supreme Court relied upon *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), for the proposition that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense" (internal quotation marks omitted), and *Lewis* itself, see 523 U.S. at 855, applied the "shock the conscience" standard.

However the standard is formulated, the Glenmore Town Board's decision to delay action on CEnergy's building permit requests could not have been arbitrary in the constitutional sense. As far as the Constitution is concerned, popular opposition to a proposed land development plan is a rational and legitimate reason for a legislature to delay making a decision. See *River Park*, 23 F.3d at 167 (explaining that "the idea in zoning cases is that the due process clause permits municipalities to use political methods to decide").

Even if the Board's treatment of the building permit applications had been arbitrary in the constitutional sense, CEnergy still would have failed to state a substantive due process claim. We have held repeatedly that a plaintiff who ignores potential state law remedies cannot state a substantive due process claim based on a state-created property right. E.g., *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003); *Centres*, 148 F.3d at 704; *Polenz*, 883 F.2d at 558–59. Without this requirement, procedural due process claims based on "random and unauthorized" deprivations of property (which might also be described as "arbitrary") could be brought as substantive due process claims even when a post-deprivation remedy was available. *Kauth v. Hartford Ins. Co. of Illinois*, 852 F.2d 951, 958 (7th Cir. 1998). This would undermine the holdings of *Hudson v. Palmer*, 468 U.S. 517 (1984), and *Parratt v. Taylor*, 451 U.S. 527 (1981), that a post-deprivation remedy is sufficient to satisfy due process in such situations. The claims would simply be reframed as substantive due process claims. *Kauth*, 852 F.2d at 958 ("Given the Supreme Court's recent decisions in *Parratt* and *Hudson*, however, we believe that in cases where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of

some other substantive constitutional right or that the available state remedies are inadequate, the plaintiff has not stated a substantive due process claim.").

We have similarly held that, regardless of how a plaintiff labels an objectionable land-use decision (i.e., as a taking or as a deprivation without substantive or procedural due process), recourse must be made to state rather than federal court. See *River Park*, 23 F.3d at 167 ("Labels do not matter. A person contending that state or local regulation of the use of land has gone overboard must repair to state court."). CEnergy had options under state law for obtaining the building permits that it did not use.

As the district court explained, the standard process in Glenmore for obtaining a building permit is set out in the "Town of Glenmore Zoning Ordinance." Under Section E.2 of that ordinance, permit requests are to be submitted in writing to the "Glenmore Town Zoning Administrator." If the Administrator does not make a decision on the application within 10 days, the application is considered denied, and the applicant then has 30 days to appeal to the "Board of Appeals." The process under the ordinance seemingly does not involve the Town Board at all. Nonetheless, CEnergy made no attempt to proceed under the ordinance, even after the Town Board refused to accept its permit applications in September 2010 and began making excuses for not taking action on the permit requests despite knowing of the deadline CEnergy faced.

Nor did CEnergy take advantage of another potential option under state law: seeking a writ of mandamus to force the town to act on the permit applications. Wisconsin courts may under some circumstances issue writs of mandamus to

compel the issuance of building permits. See *Lake Bluff Housing Partners v. City of South Milwaukee*, 540 N.W.2d 189 (Wis. 1995). CEnergy argues that a writ of mandamus to force action from the town was not a possibility because mandamus cannot be used to force legislative action. Although CEnergy may be right, its argument depends on the premise that a decision about the building permits was a legislative one. But if the building-permit decision was legislative, then it was discretionary. In that case CEnergy had no property right in the permits, meaning that the Board's delay in granting them could not have been a deprivation of property that could support a due process claim.

Confusingly, CEnergy contends elsewhere in its appellate brief that the decision whether to issue the permits was not "subject to legislative or political whims." Yet the company chose to ask a legislative body, the Town Board, to vote on the permit requests rather than proceeding under the zoning ordinance or arguing in state court for mandamus relief on the basis that the Board's consideration of the permit requests was actually an administrative function rather than a legislative one. CEnergy is thus like the unsuccessful plaintiff in *River Park*, which alleged in support of its due process claim that the city council was obliged by state law to approve a subdivision plan but intentionally delayed approval until the subdivision project was no longer feasible. CEnergy also "went along with the political process until it was too late" for another course of action and then "lost the political fight." 23 F.3d at 167. Now CEnergy seeks a judgment in federal court that would cost each resident of Glenmore roughly $6000. The company, however, must live with its strategic choices. No do-over is available through federal litigation. *Id.*

The judgment of the district court is AFFIRMED.